**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH**

**CENTRAL DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | **FINDINGS OF FACT,** |
| | **CONCLUSIONS OF LAW,** |
| **vs.** | **AND ORDER** |
| **THAD BURR,** | |
| **Defendant.** | **Case No.  2:06CR730 DAK** |

This matter is before the court on Defendant Thad Burr's Motion to Suppress. Defendant seeks to suppress evidence obtained in a search of Defendant's house conducted October 10, 2006, by agents of the Adult Probation and Parole ("AP&P") division of the Utah Department of Corrections.   The search was conducted without a warrant, and Defendant asserts that he did not give voluntary consent for the search.

An evidentiary hearing on the motion was held on January 19, 2007.  After briefing by the parties, closing arguments were heard on February 21, 2007.  At both hearings, Defendant was represented by Randy S. Ludlow, and the United States was represented by Eric G. Benson. Before closing arguments, the court carefully considered all pleadings, memoranda, and other materials submitted by the parties.  Since taking the matter under advisement, the court has further considered the law and facts relating to this motion.   Now being fully advised, the court renders the following Findings of Fact, Conclusions of Law, and Order.

## FINDINGS OF FACT

Agent Ross Williams and Agent Brent Keller work with the Utah Department of Corrections.  Their duties are primarily working as agents with the Department's division for those convicts on probation or parole, the AP&P.   Defendant Thad Burr had been placed on probation.  Both agents testified that, on October 10, 2006, they conducted a field visit at Defendant's residence.  Testimony at the hearing demonstrated that Defendant lived with his parents, and that they own the home that agents visited in Orem, Utah.

A field visit is a routine visit that is done with every probationer and ensures that the probationers are complying with the conditions of their release.   Before arriving at Defendant's residence, neither of these agents had any prior relationship with Defendant.   They were visiting Defendant on this particular occasion to clear up some questions they had about Defendant's failure to come into AP&P to sign his paperwork.

According to Agent Williams, once someone is placed on probation in the state of Utah, the sentencing judge tells the individual that they must report to AP&P, and then the individual must fill out and sign some routine paperwork that explains the conditions of their release.

Agents Williams and Keller arrived at the home with the belief that they were obligated to search Defendant's room.  Both agents, however, testified that they were aware that Defendant had not signed the "consent to search form" that AP&P provides to probationers, which was one of the reasons for their visit.

According to Agent Williams, he and Agent Keller arrived at Defendant's house wearing "ballistic vests . . . in exterior carriers.  The exterior carriers have block lettering 'police,' across

the front and across the back.  We wear our duty weapon, you know, on our appropriate side. We have a badge, as well, declaring who we work for."   Agent Keller confirmed Agent Williams' testimony and stated that in addition to the ballistic vest, firearm, and badge described above, he also wore a tazer on his left hip and carried handcuffs.  When asked on direct examination if he looked like a law enforcement officer, Agent Keller testified that "[w]e would look, quite frankly, more like a -- not just a regular patrol officer.  We are very much more marked than a regular street patrol officer would be."   On cross examination, Agent Keller admitted that the uniform is very intimidating to the average person; that the uniform looks more like a SWAT uniform than a patrol uniform; and that the uniform would appear more authoritative to a criminal than would a standard patrol uniform.

When the agents arrived at Defendant's residence, they were greeted by Defendant's mother, Mrs. Burr.  According to both agents, they asked Mrs. Burr if Defendant was home, and she replied that he was.   According to Agent Williams, Defendant quickly came to the door. Once Defendant was at the entrance to the home,  Agent Williams addressed him one-on-one, while Agent Keller stood behind to look out for any potential dangers.   According to Mrs. Burr, however, the agents were not so friendly.  She testified that they followed her into the house and started talking to Defendant.  Defendant also testified that they had crossed the threshold before he had come to the door.

During their conversation, Agent Williams asked Defendant why he had not filled out and signed the necessary probation paperwork.  According to Agent Williams, Defendant replied that his attorney had advised him that filling out such paperwork was not necessary.  Agent Williams

explained to Defendant that any such advice was false, and that Defendant would need to come down to AP&P offices as soon as possible to fill out his paperwork.   According to Agent Williams, this conversation was casual and voices were never raised.

Defendant, however, testified that he explained to Agent Williams that he had called the Utah Valley Jail about the paperwork, but jail personnel told him that he would be held there for 30 days while they got the paperwork.  At that time, because this did not sound right to him, he called his attorney.  His attorney told him not to go down to the jail yet and that he would talk to the judge and get things cleared up.  Defendant testified that at first it was a decent conversation with Agent Williams, "but then he started talking down to me like I was some sort of idiot or something."

Defendant had not entered into any agreement to allow for a search of his residence or person.  In addition, when Defendant was sentenced by Judge Lynn Davis on September 27, 2006, Defendant was not ordered to submit to any search of his person or residence nor ordered to comply with any "standard orders" that would give rise to a search of his premises.  *See* Transcript of Sentencing in Case No. 051404982 on September 27, 2006.   Defendant was not anticipating nor had he previously known that he was going to have his home or person searched by the AP&P agents.

Both agents testified that Agent Williams used a conversational tone and phrased the request to see Defendant's room as a question, specifically "will you show me where you have been staying?" at which point Defendant assented and went upstairs.   Agent Williams testified that he asked Defendant if he could see his room and Defendant responded "sure."   However, on

cross examination, Agent Keller acknowledged that in his report of the incident no indication is given that the Defendant gave any verbal consent, but merely turned and walked up the stairs. This is consistent with the testimony of Mrs. Burr, who resided in the home with Defendant and who testified that she did not remember hearing Defendant say anything before he shrugged his shoulders and walked up the stairs with the agents.

In contrast to the agents' testimony, however, Mrs. Burr testified that the agents demanded several times to see Defendant's room in the form of command, and that Defendant objected throughout that he was complying with his attorney's direction not to report to AP&P because of an administrative problem and therefore the agents' visit was a mistake.  She testified that "they just kept saying: 'Take me there . . . I need to see your room.'"  Defendant also testified that one of the agents told him, "I need to see your pad," and then he said, "Show me your room."

Both Defendant and Mrs. Burr testified that they did not feel that Defendant had any option to decline the request to see the room and that he was obligated to comply.   Mrs. Burr testified that she did not believe they had any choice other than to allow the officers to search Defendant's room. "[T]hey were police officers. They were in my home. They were, you know, with the authority, and I feel like, you know, we do what they tell us to do because they are police officers, right? You know, I didn't think that there was any choice."  On cross-examination she further testified that she did not believe that she could object when the agents followed Defendant upstairs to his room because "I wouldn't know that I could do that.  You know, you should have respect for policemen because they are the authority, and how would you do that?"

-4-

Defendant also testified that he felt that he had no choice but to comply with the agents' order to show them his room. On cross examination, Defendant further testified that when he stated on direct examination that he wanted to cooperate with the agents, what he meant was that he did not want to have to be "forced to comply" and felt as if he had no choice.

When the agents and Defendant went upstairs to Defendant's bedroom, Defendant did not hesitate or ask any additional questions. After the men entered the room, Defendant stated that "there could be a .25 auto in here." Based on that statement, the agents searched the bedroom, and the .25-caliber handgun included in the instant Indictment was found during their search.

Wayne Burr, Defendant's father, testified that he arrived at the home after the search had commenced and that he told Agent Williams that he needed a search warrant to search his home. According to Wayne Burr, Agent Williams told him that no search warrant was required and that the agents could search anywhere in the house or sheds. When Defendant's father inquired why the agents thought they could search his home, Agent Williams "said that his superior officer said that he could do that, and he just kind of had the feeling that he could do that. That's just what I got from him, that he was there and he could do it." Wayne Burr also testified that Agent Williams' attitude toward him was "arrogant, forceful, and demanding."

## CONCLUSIONS OF LAW

While it is usually necessary for officers to obtain a search warrant to search a person's home, there are a few exceptions to the search warrant requirement. "[I]t is well-settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *United States v. Pena*, 143 F.3d 1363,

1365-66 (10th Cir.1998) (internal quotations omitted).   If officers entered and searched a premises pursuant to valid consent, then such entry and search is reasonable under the Fourth Amendment.  *See United States v. Gutierrez-Hermosillo*, 142 F.3d at 1225, 1229-30 (10th Cir. 1998). "Valid consent is that which is 'freely and voluntarily given.'" *Pena*, 143 F.3d at 1366 (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973)); *United States v. Fenstermaker*, 402 F. Supp. 2d 1349, 1355 (D. Utah 2005) (quoting *United States v. Abdenbi*, 361 F.3d 1282, 1287 (10th Cir. 2004)) .

Whether Defendant's consent to search his bedroom was in fact "voluntary" is a question of fact to be determined from the totality of all the circumstances.  *Id.*  The burden falls on the government to show "that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given." *United States v. Zapata*, 997 F.2d 751, 758 (10th Cir. 1993) (internal quotation omitted).

In determining whether Defendant's consent to search was voluntary, the court should consider, *inter alia*, "physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant within the totality of the circumstances." *United States v. McCurdy*, 40 F3d 1111, 1119 (10th Cir. 1994).  In the seminal case involving consent, *Schneckloth v. Bustamonte*, the Supreme Court identified additional factors relevant in assessing the voluntariness of consent: the age of the person, his education and intelligence, his mental and physical condition at the time, whether he is under arrest, the length and nature of other interrogation and whether he has been advised of his right to refuse consent. 412 U.S. at 226.  An agent's request for consent to

-5-

search does not taint an otherwise consensual encounter "'as long as the police do not convey a message that compliance with their request is required.'" *Id.* (quoting *United States v. Griffin*, 7 F.3d 1512, 1517 (10th Cir.1993).  *See also United States v. Lindsey*, 877 F.2d 777 (9th Cir.1989) (holding consent was voluntary absent any police threats or coercion).

The Tenth Circuit has articulated a two-part test setting forth the government's burden of proof.  "First, it must present clear and positive testimony that consent was unequivocal and specific and freely and intelligently given, and the government must prove that consent was given without duress or coercion." *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998) (citations omitted).  However, "if under all the circumstances it has appeared that the consent was not given voluntarily - that it was coerced by threats or force, or granted only in submission to a claim of lawful authority - then we have found the consent invalid and the search unreasonable." *Schneckloth v. Bustamonte*, 412 U.S. 218, 249 (1973).

Evaluating the voluntariness of Defendant's consent in this case presents a close question and hinges primarily on the credibility of the witnesses.  At the evidentiary hearing, there was a significant amount of contradictory testimony between the agents on one hand and the Defendant and his parents on the other hand.   According to the testimony of the arresting agents, this was a routine, casual and consensual encounter–similar to many of the visits that they perform on an almost daily basis.   According to the agents, Defendant readily agreed to allow the search.  In contrast, Defendant and his parents testified that this was a much more confrontational and coercive encounter, and that Defendant was left with no choice but to acquiesce to the agents' demands to search the bedroom.

After listening to the testimony, the court finds that the Defendant's testimony, along with the testimony of his parents, is more credible than that of the agents.   The agents' admission that they believed they were entitled–in fact obliged–to search the room during their visit, along with Mrs. Burr's and Defendant's testimony that the agents did not politely request to see the room, but rather "demanded" several times to see the room, leads this court to conclude that the consent was not knowing, intelligent, and voluntary.  This conclusion is also supported–but not dependent upon–Wayne Burr's testimony that, after the search, the agents told him that they did not need a search warrant.

It is undisputed that Defendant was not advised of his right to refuse consent.  Indeed, the agents believed that they did not need his consent.  In addition, considering the way in which the agents were dressed, the fact that there were two of them present, and the repeated "demands" to see Defendant's bedroom, the court finds that Defendant did not voluntarily consent to allow them to search his bedroom.  Rather, he believed he did not have a choice.

The government has not met its burden in presenting "clear and positive testimony that consent was unequivocal and specific and freely and intelligently given" and that "consent was given without duress or coercion."  *United States v. Pena*, 143 F.3d 1363, 1366 (10th Cir. 1998) (citations omitted).   In evaluating the totality of the circumstances, the court finds that the consent to search the bedroom was not given voluntarily but that it was granted only in submission to coercion and a claim of lawful authority.   *Schneckloth v. Bustamonte*, 412 U.S. 218, 249 (1973).  Thus, based upon the totality of the circumstances, the court finds that the Defendant did not knowingly, intelligently, and voluntarily give consent to search.   Therefore,

-7-

the court finds that the search of Defendant's bedroom was unlawful, and the fruits of that search

must be suppressed.

**CONCLUSION**

Accordingly, IT IS HEREBY ORDERED that Defendant's Motion to Suppress [Docket

#10] is GRANTED.

DATED this 13th day of March, 2007.

BY THE COURT:

_____

DALE A. KIMBALL
United States District Judge